Before we start this morning, I'd like to thank Judge John Keenan of the Southern District of New York, an icon of the federal judiciary, for joining us and helping us this morning. So thank you. Thank you very much, Judge Loyer. It's an honor to sit with you and Judge Walker, who of course was chief judge of your court for several years. It's an honor to sit with both of you. Thank you. The honor is all ours. We have several matters on the regular argument calendar today, three of which, United States v. Nassar, 163498, United States v. Pitton, 162608, and McMillian v. the County of Onondaga, 151128, are on submission and as to which will reserve decision. And so we'll proceed with the first argued case this morning, United States v. Kazayi, 153985. Ms. Adelson. Thank you. Good morning, Your Honors. Dr. Kahazi, the defendant in this case, was a mechanic. Can you hear me? I'm not sure I reach it. Okay. He was a mechanic. He was in the United States between 2001 and 2013. He was a tech guy. He wasn't an importer, exporter, and he wasn't an Iranian operative. And over the course of his employment, he took home proprietary documents. He admitted this was a stupid mistake. Because of this and because he shipped those documents from Connecticut to California, he was originally indicted with the interstate transportation of stolen property, a crime that only requires that he knew that the documents were stolen. And I submit, had Dr. Kahazi pled to that indictment, we likely wouldn't be here today. But the government switched gears and charged Dr. Kahazi with a far more serious and far more complex offense, a violation of the Arms Control Act. What Dr. Kahazi allegedly did is after he was laid off from Pratt & Whitney, he attempted to export a 103-page PowerPoint presentation, a document that the State Department later designated as a defense article on the munitions list. And he included that in 44 boxes he was shipping home to himself in Iran via his brother-in-law's address. Though the government has depicted Dr. Kahazi as a terrible threat to U.S. security, the fact is, in this case, there is no evidence that in 2013, Kahazi shared that PowerPoint with anyone in Iran or any other technical data with anyone in Iran, that he even had a job offer in Iran. Well wait a minute, now you're talking about something else other than the legal issue. If he had said, I'm aware that the 103-page document violated the Arms Export Control Act, and I knew it at the time, and I attempted to send it to Iran, we wouldn't be here either, right? I agree with that. Okay, so let's talk about the legal issue. The only reason I raised that is because there's a lot of discussion throughout the government's brief and throughout the government's sentencing memo about something that happened in 2009. Your point is? And I want to focus on 2013, and I'll get to that now, and not 2009. Right, I don't think we want to even hear from the government on the whole thing. We've got the narrow question. Okay, Kahazi's testimony at his plea hearing did not even come close to admitting that when he packed up that PowerPoint in 2013, he knew he was violating ACCA. Neither the court nor the prosecutor ever asked him if he knew there was a munitions list, if he knew that the 103-page PowerPoint was on the munitions list, or if he knew he was violating ACCA because he included that PowerPoint in the books and papers he was sending home to himself in Iran. Kahazi's an intelligent man. He knew it was wrong to take home proprietary documents, some of which was stamped export control. I understand. Your point is that he essentially knew and believed that he had violated the earlier indictment, and that's what he basically shaped his plea to, his allocution to. Correct? Yes. Okay. This is raised for the first time on appeal, correct? Yes. Why didn't he seek to have his plea withdrawn, either before sentence or after sentence? This comes in on appeal after he's been sentenced, and I look at it as I would perhaps a person wishing to withdraw his plea after sentence, because that's essentially what we're dealing with. I think I have two answers to that. One may seem a little pat, but I don't really know whether his attorney ever told him he could withdraw his plea. But the more important answer is that the sentencing itself really didn't clarify things. If the sentencing had focused in on the 2013 export violation, then there may have been that aha moment. But instead, because the government was seeking an upward departure, it really focused in on the 2009 PowerPoint presentation and on his betrayal of his corporate employers. So by the time he got to sentencing, what he said, and I, you know, is, and let me see if I can, if I can find it here. This is at sentencing, showing he's still confused about the crime. He explained to the court that he was wrong because he broke the proprietary and confidence of the company by sharing a PowerPoint presentation with U.S. companies with an Iranian university in 2009. If we had, as I say, some sort of aha moment where we showed that he understood by the time of sentencing what was at issue here, that would be one thing. We don't have that. But I don't You have to know when he, when he takes the acts in question that he is violating the Arms Export Control Act specifically? I think that he does. In this case, in this case Does he have to know that he's exporting, illegally exporting or planning to export materials which would be, which are sensitive and, and would be controlled, would logically be controlled by whatever regime there is? I'd like, I'd like to address that by saying yes. This statute requires a this statute. And in the context of the Arms Export Control Act So everybody who violates the Arms Export Control Act by shipping to Iran or shipping to North Korea or whatever has to specifically know that they're violating the Arms Export Control Act and not that they are illegally shipping something that's prohibited. I think that you do. And I'd like to In violation of national security. I'd like to call the court's attention to a case I did not unfortunately cite in the brief. U.S. v. Doback, 789 F3D 698. I have three copies for the court and a copy for the government. Say it again, please. U.S. v. Doback, 789 F3D 698, where the Seventh Circuit, which has, had dealt with this precise issue earlier in the Polangan Cate, has this to say about technical statute. And this is, I'm going to read this because I think this answers that question. I may be wrong, but I think it does. Ordinarily a person is conclusively presumed to know the law, which is to say that ignorance of the law that one has violated is not a defense to conviction for the violation. But this principle, sensible when a person is bound to know that what he is doing is wrong, breaks down when a person who does not know of the law prohibiting what he does has no reason to think he's acting wrongfully, especially when the law is a regulation rather than a statute. May I just finish? So we interpret willfully in 22 U.S.C. 2778 to require knowledge by the defendant in this case that he needed a license to export the munitions that he exported. Didn't he admit that during his allocution? Well, I mean, in the, he admitted. Yes or no? No. I mean, I would have to say no. He admitted generally at the beginning that he read the thing. I don't have to say anything, but he at 310, 311, 312 of the appendix, he, well, in 312 in particular, he says, and based upon the training you received from your employer, you knew that that was illegal. Is that correct or incorrect? No, what was it? And that's correct. This is on 312. Well, but the court is not referring to the particular PowerPoint here. It could be anything. What the court is referring to is general documents that were stamped export-controlled. And he admitted he knew that they were documents stamped export-controlled, although he misstated what it means for something to be export-controlled. When asked if he knew what export-controlled was. Ms. Adelson, could I ask you something different? Yes. Was there a plea agreement here? Yes, there was. Did the plea agreement refer to the fact that it was the Export Control Act? Yes, it did. Did he admit that he understood the plea agreement and that he had read it and that he knew what it was? He did at the beginning of the plea. And there was also a stipulation of conduct that did the same thing. Yes, although I would say the stipulation of conduct, like much of this case, is muddled because it includes the 2009 conduct, the betrayal of the employers. It's not that it doesn't focus entirely on the crime of conviction. And as to that yet, that can always be. On plain error. I know we're here on plain error. And yet. I haven't finished my question yet. Oh, I'm sorry. I apologize. On plain error, shouldn't we consider the fact that there was a plea agreement, that described the Export Control Act violation, that there was an offense conduct stipulation, and then make of it what you will on the pages that we were just referencing in connection with his plea allocution? He says that he understood that what he was doing was illegal. Can't we take all of that together, collectively, into consideration to assess whether or not this was a legal plea allocation? Not in this case, Your Honor, because there's 60 pages or more that reflect total confusion. And even though this is plain error, it's still a constitutional requirement that the judge get from the defendant a confession to the elements of the crime to which he is pleading guilty. It's not just a Rule 11 violation. It's an actual due process violation. You said a minute ago that he had to know he was violating the Arms Export Control Act, but the case that you've cited here, Doback, doesn't indicate that. It's willfully in the sense that there had to be knowledge that he needed a license. A license means that you have to have permission to do it, and he knew he couldn't send it out without some permission. Now, that's what knowledge of you needing a license is. That doesn't mean that it doesn't tie into a specific act that he must have read and known in advance somehow or somebody told him about this particular act. Normally, that's not required. It is in certain instances where you've got a pure case of malum prohibitum, but here is a case where you've got arms export control all over these documents, and that seems to me gets you pretty far, gets the government pretty far in a case like this. Can I say two things? Number one, a lot of these documents did say stamped export control, but there's a lot of export control acts. They don't all fall under the arms export control act. There will be export control for a number of reasons. No, they don't have to. That's my point is it doesn't have to. If it's the arms export control act or it's the international export of goods act or some other act that prohibits international transport, and he doesn't know which one, but he knows that it is prohibited because he needs a license, that seems to me sufficient. Why wouldn't that be sufficient? You don't have to know the terms of a particular act. Because I respectfully disagree with you, Judge Walker. I think Palungan and Wu, there's not that many cases that deal with the state of mind in this context, but Palungan in the Seventh Circuit and Wu and then this case Dobeck, they do say you have to, this is a complex regulatory scheme, sort of like Cheek and Radscliffe, the Supreme Court case. It's not a simple case. And it isn't Malum per se. It is Malum prohibitum because he was shipping these things home to himself. Maybe Malum prohibitum, but at some point it's like Malum in say because he knows that it's subject to export controls. And at that point, it seems to me he's been informed and he has enough knowledge to know that if he does violate, if he does send these goods, that they are controlled. And he's acting in ignorance of that. I think this calls to mind in my mind a lot of these drug cases where the defendant knows he's dealing in narcotics, but the pleas are not valid because he pleads to, he says, well, I dealt marijuana and he's charged with cocaine. Or he says, I dealt in the Culbertson case three kilos, but he's charged with five kilos. Sometimes, and I think this case is one of those times, you have to know what it is that you did was wrong, particularly when the plea itself reflects so much confusion and confusion by the court as well. It's a light in the question when you say you have to know what you did was wrong because you can know what you did was wrong without knowing that it violates a particular provision of the criminal law. But, for instance, structuring in a money laundering case, there you have to have more specific knowledge because just shipping money and shipping cash and going to the bank and depositing a certain amount of money, you have to know about because people deposit money all the time. But people do not ship goods that are subject to export control all the time. Well, he was shipping goods, and I'll be frank, I had to check whether, in fact, if you're a dual citizen and you pack up your belongings and send them home to yourself in Iran, is that an actual export? It's not that clear. I mean, it's not like it was going to a defense contractor, a university, another employer. He was shipping them home to himself. I don't think it's so crystal clear that that's a wrong. And not everything that you send to Iran is a wrong. You know, there's plenty of things you can send. There's an exemption, for instance, for household belongings, and he had household belongings in it. This is a very complex area of the law, and I think it was up to the court and the government, and they knew that he didn't understand what he was pleading to. The court said you haven't pled guilty to willfulness. The court said you're unwilling or unable to tell me what it is that constitutes the crime. I can't accept the crime. They should have clarified it. If they did, we might not be here today. I have another question. Okay. A more general one. Does he really want to withdraw his plea? Because if he does withdraw his plea and this case goes to trial, he might end up with a much harsher sentence than the 97 months that he got. Your Honor, I've thought of that myself. I can't say I haven't thought of that myself. I'm a CJA-appointed lawyer. He has asked me to move to withdraw his plea. What he wants beyond that is not my professional responsibility. I think I've complied with my professional responsibility in that regard. Okay. But all I'm saying is that this may end up being, if he were to prevail here, he might rue the day that he decided to withdraw his plea. He very well might. I have an ethical obligation to argue his appeal, and I do believe that I have fulfilled that professional obligation. You do have an obligation to that, and I don't want to inquire into your confidences with him. But by the same token, it seems to me appropriate for any lawyer to explain to the client what the consequences of withdrawal of the plea could be in the worst-case scenario. Without disclosing confidence, as I'll say again, I feel like I complied with my ethical obligations. Thank you very much. Thank you very much, Your Honor. You've reserved two minutes for rebuttal. Ms. Richards. May it please the Court, my name is Vanessa Richards, and I'm here to represent the government in this appeal. I'd like to really get directly at your question, Your Honor, which is did Dr. Kazi specifically admit to the conduct at issue? And I would direct the Court's attention to the joint appendix, or actually the defendant's appendix, starting really at page A-308. As Your Honors are aware from the record, the defendant in this case came to court. He stated at the initial outset that he wanted to plead guilty to a written plea agreement. That plea agreement can be found at the appendix at A-33. That plea agreement on A-34 specifically delineates each of the four elements of the crime for which he was charged. During the course of the plea colloquy, the Court systematically went through all of the necessary rights and obligations that he would be waiving, explained to him both personally as well as asked the government to explain what he was charged with and what the elements were, what the maximum penalties were. And then the Court asked the government to please explain what the factual basis was for the plea. That makes up the vast majority, frankly, of the 60 pages that defense counsel is referencing to. Now, once the . . . Can I just add something here? Yes. It does indicate, it's apparent that for a while during the proceeding, I'm not sure for how long, and that's obviously in dispute, he thought he was pleading guilty because he didn't have the permission of his employer to release this information. It was stolen material. And even when you go as late in the plea as 310 to 312, what does export control mean? The question is asked by the Court. The defendant means you cannot export to anyone else unless you get a specific license from the company. Now, to the extent that he is thinking about stolen material, stolen from the company and distributed, which was the subject of the first indictment, this all makes sense. But after that, it makes less sense in terms of the Arms Export Control Act. So, Your Honor, if I may, I respectfully disagree with the characterization that he thought he was pleading guilty to stolen property. I'm not saying that ultimately. I'm talking about the dialogue up until you get to this discussion of what does export control mean, license from the company. And you go back, forth, back, and your adversary's point is that for quite a bit of time, he believed he was pleading guilty to the earlier crime. So, let me direct the question first with respect to the company. In the situation that Dr. Kazi found himself in, in his entire profession, which had been working for three different clear defense contractors on work that was almost exclusively oriented to the Air Force's fighter pilot systems, when he needed a license in order to do this, it was the company that would acquire the license on behalf of the individual. So, if, in fact, there was an export that would happen with respect to any of this material, it was the company that would acquire the license. It would never have been Dr. Kazi acquiring the license. And so, that, I don't think, reflects the fact that he thought. He was capable of being read both ways then. That I understand. That's an ambiguity that would have to be cleared up by the judge. And that I do understand. But I will say that I think that actually did happen. Interestingly, subsequently, when the judge starts entering into this colloquy with him at 310, and says, after she says, what does export control mean, and they start going through the issue, they start saying, well, to whom did you ship this material? This is on page A311. And he says, well, as to example, to one, two, three companies in the United States, which I did interview, and also an overseas university, and, of course, the shipment that was supposed to leave the border in the United States of 2013. The court says, so, on four occasions, you shipped information both within and outside the country, which you knew was illegal to ship, and you did it knowingly and willfully. He corrects her at that point, Your Honor. He says, yeah, in two occasions, one sharing with the university, and one that was intercepted before leaving the border to the United States, so-called. He understood in that situation that he was exporting this in violation of the law. And if you turn back to page 306, interestingly, in this situation, the judge, when she was going through the colloquy with him, at a certain point when she says, you know, I don't think that you've established willfulness, or I don't think you've allocated to willfulness. Why don't you take a moment? Actually, the lawyer was trying to allocate for him. The judge says, you can't allocate for him. Let's take a break. Dr. Cossie tries to jump in at that point. And the court, being careful, says, no, sir, why don't you take a minute to consult with your attorney? He could have, after that 80-minute recess, come back and said, wow, you know what? I didn't know about this whole willfulness thing, and I didn't understand that despite the plea agreement, despite the Fry hearing, despite all of these things, I had no idea that I was pleading guilty to an export violation. I don't want to do this anymore. But that's not what he does. He comes back, and starting at 305, rather, A305 to A306, the court says, would you like to elaborate on or expand your description of what you did, or are you satisfied with what you've said so far? And the defendant says, without any prompting beyond that, basically to summarize, I have made a bad decision in, first of all, possessing the document and shipped them illegally to overseas and share it with anybody. That was a violation of export control. So the decision I made was incorrect. I had the PowerPoint, not a PowerPoint, not multiple PowerPoints, the PowerPoint. And the PowerPoint and the so-called, that's the second document, I would guess, where it says unintelligible, is that the whole thing is PowerPoint. No, there's a combination. It could be a combination of other things. Certainly was more than the PowerPoint in some cases. So nevertheless, all of them, they require export license, which I did not have. And then subsequently, on page 306, I had possession of controlled element that required license that I didn't have, and I had possession of them in the form of PowerPoint and things that belong, paper that belongs to the property, the court. So you had possession of things that were under, you said, ITAR control. Is that what you said? Yes, yes. So, Your Honor, in a plain error standard, with respect to plain error, not only do we feel that this isn't an error, it's certainly not plain. The judge had the ability to speak with him and interact with him. Her impressions of him are entitled to some deference, as she was able to see whether or not what his body language was, what his eye contact was. It was for her to make a determination in some respects as to whether or not he was minimizing his conduct or whether he fully understood the charges to which he was pleading. Additionally, the defense in this case has utterly failed to establish that, to Your Honor's point earlier, if, in fact, none of these so-called errors had happened, that he would have persisted in his not-guilty plea. Let me ask you this, then. Aren't you setting yourself up, when I say yourself, I mean the office. Aren't you setting yourself up for a 2255 here? If you press this point about the fact that he didn't seek to withdraw the plea, it's a strickling against Washington. So, Your Honor, there... Aren't you setting yourself up for that by arguing that? No, Your Honor, respectfully, I don't believe we are. The evidence in this case, and again, if you look to the totality of the facts that are in the record, the defendant pled guilty in this case because he was guilty. The 103-page document that's issued here was emblazoned all over itself with ITAR warnings. It specifically referenced, in fact, the specific munitions list violation category it fell into. But regardless, and it was clear with respect to everything that's in the PSR, all of the evidence that the government had, that he was guilty. So it's actually not surprising whatsoever. In the record, was it clear that he, was there a statement that he had read the plea agreement? Yes, Your Honor, there was a statement that he had read the plea agreement. And that was on the record? Oh, absolutely, Your Honor. So not only is it on the record that he had read the plea agreement, in fact, I believe his exact words when asked was, I have no issue with the plea agreement whatsoever, something to that effect. There's no question that he certainly wanted to plead guilty at the time he did it. The question is really what was in his head when he did that. And also, I think what you're also, a point that wasn't stressed in the briefing, was the fact that we don't hear of anything about a problem with the plea until the appeal. Correct. Well after the sentencing, well after the opportunity he would have had to move to withdraw his plea, either before or after the sentencing. And, Your Honor, if I may just respond. I see I've gone over my time, but if I may make one point, just a final point with respect to that issue. I believe there is some contention in the defense brief that the PSR is nothing but allegations. It's just the government's facts. The reality is the PSR was presented to the defendant on the record in the sentencing hearing. The judge asked the defendant whether or not he had the opportunity to read the PSR. He said he had. She then asked him whether or not he had any objections to the PSR. He said no, he did not. And then she adopted the PSR as the facts and findings of the court. So that PSR detailed the criminal conduct at issue here, detailed the relevant conduct as well, and there was no objection made by the defendant. That's why I think there's no disagreement that we're on plain error review. Thank you very much. Thank you, Your Honor. Ms. Adelman. Just a few quick things, Your Honor. Number one, at some point I think my adversary said that the 103-page document had emblazoned on it ITAR-controlled. I don't think that's true because I last night went through everything to see if the government has ever ‑‑ I don't have the document, but I do not see one place where they say that document said ITAR-controlled. Other documents may have said ITAR-controlled, but I don't know that that's true. But going to the bigger picture of those last pages of the plea where supposedly everything got resolved, I just want to point out a few things that Dr. Kahazi said that reflect that even in those pages he was still mixed up, and some things the court said that show that maybe she contributed to the mix-up. When they read a paragraph where he says, I made a bad decision. Now, he had to confess to willful conduct. A bad decision is not willful conduct. He says all of them require an export license. That's not true. All of those documents didn't require an export license, and it just shows again that he really didn't understand what required what kind of export license. There's the part where they refer to ITAR-controlled, and he says, yeah, they were ITAR-controlled. That's on page 308, and it's on the very next page that the court says to Dr. Kahazi, I can't take this plea because you're unwilling and unable to tell me what you did that was wrong. Well, what does that mean? If he's unwilling to say it, it means he's not voluntarily conceding guilt to ACCA. And after a break, he is willing to say it. No, this is after the break, Your Honor. 36307, 308, and then she allocutes him, and he's willing to say, I understood what I was doing was wrong. I didn't have a license. Now, DOBEC, which you referred to, the Seventh Circuit case, so we interpret willfully to require knowledge by the defendant in this case that he needed a license to export the munitions that he exported. No, I'm sorry. I think it's at 309. The court says he understands what constitutes the admission of the offense, but he is not willing or able to tell me what he did that constitutes the admission of the offense. And then there's a few pages where he talks very generally about, well, if you have acts where, what does export control mean? That's where he says I need a license from the company, and did you know you didn't have a license? Yes. And then he says when I shipped it to two or three companies in the United States and overseas, which gets us back to the 2009 PowerPoint presentation, over which there's confusion. And basically he says, yes, I shipped it. And as to the training, I just want to make one quick point as to the training. I have my red lights on. We don't know what kind of training he received on the munitions list, which, as our addendum to the reply brief shows, is incredibly complicated. But he left Pratt Whitney in August 2013. This 2013 PowerPoint presentation that the State Department later designated as falling under Category 19G of the munitions list, well, that category wasn't added to the munitions list until October 2013 after he left Pratt Whitney. It's very unlikely he received any training on whether that particular PowerPoint constituted a munitions list document. Thank you, Your Honors. Thank you. Rule reserve decision.